IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

HELENE M. TYRRELL                                                                              PLAINTIFF

VS.                                              CASE NO. 6:10-CV-06102

OAKLAWN JOCKEY CLUB; and
SOUTHWEST CATERING CO., INC.                                                      DEFENDANTS

## MEMORANDUM OPINION

Before the Court is Defendants' Motion for Summary Judgment. (ECF No. 16). Plaintiff has responded (ECF No. 21), and Defendants have replied. (ECF No. 25). The matter is ripe for the Court's consideration. For the following reasons, the motion will be granted.

## BACKGROUND

The Oaklawn Jockey Club in Hot Springs holds horse races during its annual live meet from January through April. In January 2010, Plaintiff was hired as a seasonal worker at the buffet line in Lagniappe's, the club's restaurant; she had worked as a seasonal employee at the club for five previous seasons. Plaintiff was moved to a prep-cook position in the kitchen a few days after she started for the 2010 season because the buffet line was overstaffed.[1] This case concerns her co-workers' behavior in the kitchen and her supervisors' response to that behavior.

The chronology of this case is a bit murky, but it begins in substance shortly after Plaintiff was moved to the kitchen, when she says she was subjected to "racially hostile statements and other behavior that constituted a hostile work environment." (ECF No. 1, at 2). The racially hostile statements involved allegedly heavy use of the n-word. Plaintiff, who is

---

[1] Plaintiff's complaint states that she was moved "about a week or two" after she started (ECF No. 1, at 2), but in her response to Defendants' statement of facts, Plaintiff states that she was moved after only two or three days. (ECF No. 24, at 1).

1

African American, found the language offensive. She admits, however, that on all but one occasion, her co-workers, who are also African American, directed the talk at themselves and not at her.

Plaintiff took off from work in mid-January to have eye surgery. In early February, when she returned to work, she confronted her co-workers about their language. Some of her co-workers agreed to clean up their language, but others refused. When direct appeals to her co-workers failed, Plaintiff went to Chef Richard Davis, her immediate supervisor. Davis told her co-workers to stop using the offending language.[2] When Davis's admonition went unheeded, Plaintiff went to Chef Howard Brooks, the individual who hired her for the position.[3] She complained to Brooks, she thinks, around a week after returning from surgery leave. Brooks told her that the offending workers would be let go at the end of the live meet, when seasonal workers were no longer necessary.

Plaintiff had at least two other conversations with Brooks in March regarding the offensive language, on the 13th and the 20th. (ECF No. 21-2, at 31). On March 21, 2010, Plaintiff again confronted one of her co-workers about his language. The next day she talked to the Equal Employment Opportunity Commission ("EEOC") before heading to work. When she got to work, the manager at Lagniappe's, Leslie Gillert, talked to Plaintiff about her complaints. Gillert passed the complaints up the supervisor chain all the way to Jimmy Johnston, the food-and-beverage director. Johnston told Karie Hobby and Mary McGrew, two mid-level

---

[2] In Plaintiff's complaint, she states that "Davis failed to take any action..." (ECF No. 1, at 2), but in her response to Defendants' statement of facts, Plaintiff admits that Davis told the co-workers to stop using the language. (ECF No. 24, at 2).
[3] Again, the facts are unclear. In Plaintiff's complaint, she states that she went to Davis *before* Brooks (ECF No. 1, at 2), but in her deposition, she states that "I went to Chef Howard before I went to Chef Richard about it." (ECF No. 21-2, at 26).

supervisors, to meet with Plaintiff and then report to Belinda Castleberry, the human-resources manager.

McGrew and Hobby met with Plaintiff on March 26, 2010, and then reported to Castleberry. Castleberry in turn met with Chef Davis and Chef Brooks. She warned each of them that they should document and follow up on any offensive-language issues. Castleberry also told Jimmy Johnston to set up a meeting with the kitchen staff to go over any language issues and explain that offensive language would lead to discipline, including termination. Johnston held the meeting that same evening, March 26. Castleberry also told Johnston to have someone follow up with Plaintiff to make sure she was satisfied that the bad language had stopped.

On March 27 or 31, Plaintiff again complained about offensive language, and her two offending co-workers were sent home with a warning that they would be suspended if there were any more bad-language incidents.[4] The live meet ended on April 10, 2010, and Plaintiff was let go on April 16, 2010. Out of 428 seasonal food-and-beverage employees hired for the live meet, only five were kept on after the meet ended, and only as part-time workers.

Plaintiff filed a complaint with the EEOC on April 2, 2010 and received her right-to-sue letter on October 14, 2010. She filed her complaint in this Court on December 23, 2010 seeking damages for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 *et seq.*, and violations of the Arkansas Civil Rights Act, Ark. Code Ann. § 16-123-101 *et seq.* According to Plaintiff, Defendants subjected her to a hostile work environment and then fired her for complaining about that environment. She also contends that Defendants wrongly withheld her final paycheck for an extended period of time. Defendants now move the Court to enter

---

[4] The dates here are again unclear. The 27th (ECF No. 22, at 4), the 29th (ECF No. 1, at 3), and the 31st (ECF No. 24, at 5) are all possible dates based on the record.

3

judgment in their favor because the undisputed facts fail to support Plaintiff's legal claims.[5]

## STANDARD OF REVIEW

The standard of review for summary judgment is well established. The Federal Rules of Civil Procedure provide that when a party moves for summary judgment:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(a); *Krenik v. County of LeSueur*, 47 F.3d 953 (8th Cir. 1995). The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). *See also Agristor Leasing v. Farrow*, 826 F.2d 732 (8th Cir. 1987); *Niagara of Wis. Paper Corp. v. Paper Indus. Union-Mgmt. Pension Fund*, 800 F.2d 742, 746 (8th Cir. 1986). A fact is material only when its resolution affects the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id*. at 252.

The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id*. The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik*, 47 F.3d at 957. A party opposing a properly supported motion for

---

[5] The parties make no effort to differentiate the two named Defendants, so the Court will likewise treat them together.

summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256.

## DISCUSSION

### I. Hostile work environment

Plaintiff claims that racially charged language at work constituted a hostile work environment that violated Title VII and the Arkansas Civil Rights Act. The two laws are analyzed the same way. *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 615 n.3 (8th Cir. 2000). "The question of whether an environment is sufficiently hostile to be actionable is a legal question, and, like any legal question, is a matter for the court to decide. In other words, a showing of some minimal level of harassment is necessary before a case is submissible to a jury." *Jackson v. Flint Ink N. Am. Corp.*, 382 F.3d 869, 869 (8th Cir. 2004).

A successful hostile-work-environment claim must show that: (1) Plaintiff belongs to a protected group; (2) Plaintiff experienced unwelcome harassment; (3) there was a causal link between the harassment and Plaintiff's membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) Plaintiff's employer knew or should have known about the harassment and failed to take proper action. *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005). The harassing conduct must be enough to create a hostile environment from the objective standpoint of a reasonable viewer and from the subjective standpoint of the Plaintiff. *Green v. Franklin Nat'l Bank*, 459 F.3d 903, 910 (8th Cir. 2006) (quoting *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998)).

In answering the question whether a work environment is actionably hostile, the Court looks at all the circumstances. *Malone v. Ameren UE*, 646 F.3d 512, 517 (8th Cir. 2011). Racial comments often tread a fine line. When racial comments dominate the working environment,

Title VII is violated. *Green*, 459 F.3d at 911 (quoting *Jackson v. Flint Ink N. Am. Bank*, 370 F.3d 791, 794 (8th Cir. 2004) (internal quotations omitted), *mod. on other grounds*, 382 F.3d 869 (8th Cir. 2004)). However, not all harassment is actionable, because not all harassment is enough to affect a term, condition, or privilege of employment, as the law requires. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Thus, conduct such as uttering a racial epithet may be offensive without being actionable. *Canady v. Wal-Mart Stores, Inc.*, 440 F.3d 1031, 1035 (8th Cir. 2006) (internal quotations omitted). The issue is whether the conduct is merely rude or unpleasant, or is instead "extreme in nature." *Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 846 (8th Cir. 2006) (citing *LeGrand v. Area Resources for Cmty & Human Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005) (citation omitted)).

Considering all the circumstances, the Court finds that Plaintiff's hostile-work-environment claim seeks more to impose "general civility" on the workplace than to curb heinous harassment. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (noting requirements that prevent "Title VII from expanding into a general civility code"). While Plaintiff might subjectively have found her co-workers' language offensive enough to create a hostile environment, a reasonable person in her shoes would not.

The offensive language in this case is the n-word. Plaintiff is African American. Her co-workers are African American. That does not by itself preclude a hostile-work-environment claim. *Ross v. Douglas Cnty, Neb.*, 234 F.3d 391, 396 (8th Cir. 2000). But combined with the fact that Plaintiff was only once the target of the language, and in a non-derogatory context,[6] the Court has trouble seeing how an objective person in Plaintiff's position would have found her co-workers' jesting "extreme in nature." By all appearances, the term was not used derogatorily

---

[6] The comment directed at Plaintiff and one other co-worker happened after the kitchen crew nearly missed getting breakfast out one Sunday. The comment was, according to Plaintiff: "I told you niggas we could get this done. I told you we could do this. Y'all my niggas." (ECF No. 21-2, at 32).

at all. It might have offended Plaintiff, but viewed objectively, the language was at most course jesting.

Moreover, even if Plaintiff did in fact experience a hostile work environment, she has not met the fifth element of her claim, which is that Defendants failed to take proper remedial action. "[A]n employer is not liable if it takes prompt remedial action that is reasonably calculated to stop the harassment." *Engel v. Rapid City Sch. Dist.*, 506 F.3d 1118, 1123 (8th Cir. 2007) (citing *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999)). It is the calculation that counts, not the result; "remedial action that does not end the harassment can still be adequate if it is reasonably calculated to do so." *Id.* (quoting *Moore v. Philadelphia*, 461 F.3d 331, 350 (8th Cir. 2006)).

Defendants' remedial action in this case was prompt and reasonably calculated to end the hostile environment. The offending co-workers were admonished in unqualified terms. Management passed Plaintiff's complaints up the managerial ladder and met with Plaintiff several times to make sure that her complaints were understood and acted on. When the language problem refused to die, Defendants threatened the offenders with suspension upon the next occurrence and sent one worker home.[7]

Thus, even if a hostile environment existed, Plaintiff has not shown that Defendants' response was insufficiently prompt and not reasonably calculated to end the hostile environment. Plaintiff's hostile-work-environment claim thus fails as a matter of law.

**II. Retaliation**

Plaintiff next argues that she was denied continued employment and had her final paycheck withheld in retaliation for her complaints to the EEOC and to her supervisors. Because Plaintiff has produced no direct evidence of retaliatory motive, she must prove each of the

---

[7] The other worker had already left for the day.

*McDonnell Douglas* factors to create an inference of retaliation. *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 936 (8th Cir. 2006) (citations omitted). That requires: (1) making out a prima facie case of retaliation; (2) giving the employer a chance to rebut the presumption raised by the prima facie case by putting forth a legitimate, non-retaliatory reason for its action; and (3) then refuting the employer's asserted reason as just a pretext. *Id.* (citations omitted).

### a. Prima facie case

First, Plaintiff must make out a prima facie case of retaliation. To do that, she must show that (1) she engaged in activity protected by the statute; (2) Defendant took adverse employment action against her; and (3) the adverse action was connected to the protected activity. *Bakhtiari v. Lutz*, 507 F.3d 1132, 1136 (8th Cir. 2007).

### 1. Protected activity

Plaintiff claims that her complaints about the hostility of her environment were protected activity under Title VII. The fact that Title VII does not in fact prohibit the working environment she complained of does not by itself mean that her complaints were unprotected. She did not, in other words, have to be correct about the Title VII-status of the environment she complained about; she merely had to be reasonable in her belief that the environment ran afoul of Title VII. *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 714 (8th Cir. 2000). The Court will thus assume without deciding that Plaintiff undertook a protected activity by complaining about her work environment.

### 2. Adverse action

Plaintiff contends that Defendants' decisions not to keep her on staff after the live meet ended and to withhold her final paycheck pending the return of her ID badge were adverse employment actions.

### i. Not being kept on staff

While being fired from an at-will job is an adverse action, the non-renewal of an expired fixed-term contract does not necessarily rise to that level. *See Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 628 (7th Cir. 2009) (noting Illinois's refusal to find non-renewal of fixed-term contracts to be adverse action). Plaintiff's employment situation in this case is ambiguous at best, given that she was a past seasonal employee who was hired without an application or interview for an allegedly seasonal position. She alleges that she was promised a position that would continue after the live meet ended. However, there is no written contract to that effect.

Given these complications and disputed facts, the Court will assume without deciding that Plaintiff's non-renewal was an adverse employment action.

### ii. Withholding final paycheck

Plaintiff also contends that Defendants held her final paycheck until she returned her ID badge to retaliate against her for complaining about her work environment. To be adverse, an action must be one that a reasonable employee would call materially adverse, i.e., one that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *BNSF Ry. Co. v. White*, 548 U.S. 67, 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (quotations omitted)). "Petty slights or minor annoyances" are thus insufficient to show retaliation. *Id.*

The question in this case, then, is whether a reasonable employee in Plaintiff's shoes would be dissuaded from complaining about a hostile work environment by the threat of having to turn in her ID badge to get her final paycheck. The Court finds that a reasonable person in Plaintiff's shoes would not be so dissuaded.

Plaintiff has thus failed to show that Defendants' requirement that she turn in her ID badge to receive her paycheck was an adverse action.

### 3. Connection between protected activity and adverse action

Assuming Plaintiff's work-environment complaints were protected activity and that Chef Books was authorized to promise her a continuing job and did in fact promise her a continuing job before her termination, Plaintiff still must show a causal connection between the complaints and her firing. *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002).

The causation required is not but-for causation, but rather a showing that "an employer's 'retaliatory motive played a part in the adverse employment action.'" *McBurney v. Stew Hansen's Dodge City, Inc.*, 398 F.3d 998, 1003 (8th Cir. 2005) (quoting *Kipp v. Mo. Hwy. & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (quotation omitted)). In all but the rarest cases, the length of time between the protected activity and the adverse action will not alone establish causation. *Smith*, 302 F.3d at 832–33 (citing cases). While two months' time is insufficient as a matter of law, "a matter of weeks" might suffice. *Id.* at 833 (citing cases).

Plaintiff claims that her job at the Oaklawn club should have continued after the 2010 live meet ended. She contends that she was let go along with all the other seasonal employees—save five—because she complained about her work environment. Her complaints began in earnest when she returned from surgery leave in late January or early February. She talked to several of her superiors, who arranged meetings with her, with each other, and with her co-workers to discuss her complaints. One offending co-worker was sent home one day in late March—the other co-worker had already left for the day—and was told that another language issue would mean suspension. The other co-worker was told the same thing.

Plaintiff filed her EEOC charges on April 2, 2012. The 2010 live meet ended on April 10, 2012, and Plaintiff was fired on April 16, 2012.  Plaintiff argues that chronology alone creates a fact question on discrimination in her case. All the facts, however, point away from discrimination, and those facts overcome the chronology of this case.

First, the record shows that Defendants thoroughly investigated and followed up on Plaintiff's complaints. Nearly every level of management was involved in settling her grievances. When, through no lack of diligence on Defendants' part, the two offending co-workers persisted in using offensive language, they were threatened with suspension upon one further violation.

Second, Chef Brooks's comments encouraging Plaintiff to stick out the discomfort because the offending co-workers would be gone at the end of the live meet undercuts Plaintiff's retaliation claim as much as it supports it. It seems unlikely that Defendants would fire Plaintiff for complaining about the work environment after they had responded to those very complaints by reassuring her that the environment would soon improve and that she would be around to see it. In other words, Defendants knew about Plaintiff's complaints when, according to her, they inferentially promised her continued employment. Plaintiff's alleged promise of employment is inconsistent with her retaliation claim.

Plaintiff has failed to show that Defendants' decision to fire Plaintiff rather than hold her over after the live-meet ended was partially motivated by retaliation. She has thus failed to state a prima facie claim under *McDonnell Douglas*, and her continued-employment retaliation claim cannot survive summary judgment.

## CONCLUSION

For the above reasons, the Court finds that the undisputed material facts foreclose Plaintiff's hostile-work-environment claim and her continued-employment retaliation claim under Arkansas law and Title VII. Accordingly, Defendants' Motion for Summary Judgment (ECF No. 16) should be and hereby is **GRANTED**. Plaintiff's hostile-work-environment claim and retaliation claims are hereby **DISMISSED WITH PREJUDICE**. The Court will enter a separate judgment consistent with this opinion.

IT IS SO ORDERED, this 2nd day of November, 2012

/s/ Susan O. Hickey
Hon. Susan O. Hickey
United States District Judge